IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 2:20-cr-61 |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN MALCOLM BARESWILL, | ) | |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

    The United States of America, through its attorneys, G. Zachary Terwilliger, United States Attorney, and Andrew Bosse, Assistant United States Attorney, hereby submits its position with respect to the defendant's sentencing factors.  In the Presentence Investigation Report (PSR) prepared in this matter, the United States Probation Office determined the applicable guidelines range to be a term of 12-18 months of imprisonment, based on a Total Offense Level of 13 and a Criminal History Category of I.  In accordance with Section 6A1.2 of the Sentencing Guidelines Manual and this Court's policy regarding sentencing, the United States represents that it has reviewed the PSR and consulted with the Probation Office and defense counsel.  Neither party has objected to the PSR.

    For the reasons outlined below, the United States respectfully submits that a sentence at the high end of the guidelines range would be sufficient but not greater than necessary to accomplish the goals of 18 U.S.C. § 3553(a).

I.  **Background**

On June 11, 2020, the defendant was charged by criminal complaint with using a telephone to make a threat concerning an attempt to kill, injure, or intimidate an individual, or unlawfully damage or destroy a building, by means of fire, in violation of 18 U.S.C. § 844(e). ECF Nos. 1-2.  The parties agreed to extend the deadline for indictment, ECF Nos. 17, 19, and the Court denied the defendant's subsequent request for release on bond after a contested detention hearing, ECF Nos. 20, 22.

On August 5, 2020, the defendant pleaded guilty to a one-count criminal information charging the same violation of § 844(e).  ECF Nos. 23, 25-28.  As part of the plea agreement, the government agreed to move for an additional one-point reduction to the U.S. Sentencing Guidelines offense level if the offense level were calculated at 16 or higher.  ECF No. 26. Sentencing is scheduled for November 12, 2020.  ECF No. 25.

II. **Position on Sentencing and Argument**

"[I]n imposing a sentence after *Booker*, the district court must engage in a multi-step process.  First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range."  *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'" *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)).  In making this determination,

> a sentencing court must consider "the nature and circumstances of
> the offense and the history and characteristics of the defendant"
> and the need "to reflect the seriousness of the offense," provide
> "just punishment," "afford adequate deterrence," "protect the
> public," and "avoid unwarranted sentence disparities among

> defendants with similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)).

The parties agree that the advisory guideline range is 12-18 months of imprisonment. As discussed below, the government argues that a sentence at the upper end of the advisory guideline range is reasonable and warranted.

    A.    <u>Nature and Circumstances of the Offense</u>

        1.    <u>The threatening call</u>

On June 2, 2020, one week after the death of George Floyd in Minneapolis, the Virginia Beach Interdenominational Ministers Conference organized a prayer vigil and demonstration at Mount Trashmore Park. The Ministers Conference, which includes representatives from a number of primarily African American churches in Virginia Beach, is a Christian ministry that actively advocates for voting and employment rights, social and racial justice, and other issues of importance to its membership.

Local media reported that the associate pastor at New Hope Baptist Church and president of the Ministers Conference, along with the pastor of another predominantly African American church, spoke at the vigil. Speaking alongside the pastors were a number of local civic leaders, including the acting Virginia Beach Police Chief, the former Virginia Beach Police Chief, a city councilman, and a Virginia Beach congresswoman. In addition to asking for justice for Mr. Floyd, several speakers advocated for a more diverse local police force and a boycott of local businesses as a way to draw attention to their concerns about racial justice issues.

The defendant's mobile phone showed that he viewed a Virginian-Pilot article[1] reporting on the prayer vigil on June 6, 2020, as well as a WAVY TV article focused on the call for a boycott.[2]

On the morning of Sunday, June 7, a New Hope Baptist assistant minister, G.W., and another volunteer, E.L.—both older women deeply involved in New Hope's ministries—were at the church, leading approximately fifteen church members in a Bible study class. The class was held by telephone in light of the ongoing pandemic. G.W.'s three grandchildren, ranging from ages six to eight, were there with her. During the class, G.W.—described as Witness 1 in the Statement of Facts—noticed an incoming call. She put the Bible study on hold and placed the incoming call on speakerphone. She then heard the caller—the defendant—say words to the effect of, "You [n-words] need to shut the fuck up." *See* PSR ¶ 5. The caller then threatened to burn down the church. E.L.—described as Witness 2 in the Statement of Facts—also heard the caller use the n-word and threaten the church. *Id.* The three young children, unfortunately, also heard the call.

G.W. and E.L. were shocked by the call and concerned for their own safety, the safety of G.W.'s grandchildren, and the church itself. G.W. sent an email to the church's associate minister telling him what had happened. E.L., worried that someone was outside the building and ready to set it on fire, began looking out of the window. The women decided, however, that rather than let the threat deter them from continuing their ministry that morning, they would push on. As G.W. explained, she returned "back to our Lesson because I did not want what this man

---

[1] https://www.pilotonline.com/news/vp-nw-protest-mount-trashmore-20200603-o2ya73ykf5hojezfyvjepsg7sm-story.html (available as of November 4, 2020).
[2] https://www.wavy.com/news/local-news/virginia-beach/were-going-to-make-our-voices-heard-vb-ministers-call-for-month-long-boycott-of-oceanfront-and-town-center-businesses/ (available as of November 4, 2020).

said to affect what we were talking about." G.W. Ltr.  They ended the class, as always, with prayer.

The Virginia Beach Police Department moved quickly after it learned about the threat. Working with the FBI and the Virginia Beach Fire Department, investigators obtained phone records for the church's phone line and confirmed it had received only one incoming call during the Bible study class, from a number associated with the defendant.  Records from the defendant's cellular service provider confirmed that his phone made the call, and that he had attempted to use the *67 prefix to block the incoming number from being displayed by caller ID. The phone records showed that the defendant also had called the church on Saturday, June 6, but that his call had not been answered.

Agents interviewed the defendant on June 9 and received consent to search his phone. While he denied placing the call—he claimed he was asleep—his phone indicated otherwise. Agents found that he had used his phone's internet connection to run recent searches that included the phrases "Black Lives Matter protest held in Virginia," and "Who organized the protests from mount trashmore to town center."  He had also searched the internet for other phrases indicative of his mindset and intent, as described in the Statement of Facts.  The defendant also used the phone to look up information about at least two other predominantly African American churches in the local area.  He called at least one of those other churches as well, but that call went unanswered.

    2.    <u>The victims</u>

While the defendant characterizes this essentially terroristic conduct in his letter to the Court as a "stupid … idea," "vent[ing]," and "snapp[ing]," it was much more than that to those on the receiving end of his hateful threat.  Just as in cases involving active violence, the crime

5

here started and ended in just a few minutes, but the effects of the crime on the victims continue to be felt, and will continue into the future.

The Court will have the benefit at sentencing of reading victim impact statements from G.W. and E.L.[3] Both women have devoted themselves to New Hope Baptist and volunteer their time to support its ministries. The church and its community of believers are at the center of their lives.

As G.W. explains, she had never in her life been called the n-word until the defendant used that vile slur against her while threatening to burn her church. True to what she professes, she has not let the slur define her; as G.W. explains, "I know that I am somebody because of the Christ that's living inside of me." G.W. Ltr. The fear of what happened that day, however, has stayed with G.W. As she explains in her letter, she regularly used to work at the church after hours and on weekends, but tries to avoid doing so now. *Id.* What happened on June 7, she says, "was a wake-up call for me." *Id.* G.W.'s grandchildren, thankfully, were more fixated on the defendant's use of curse words than on his threat. Still, they too will carry this with them for life: the idea that a man would first reduce their grandmother to a racial slur and then threaten to harm her because of the color of her skin. The defendant, to his credit, has apologized for what he did. But there is no apology that can put that particular poison back in the bottle.

E.L. was even more disturbed by what she heard that day. As she explains, she feels the same now as she did then—"[i]t's in the back of my head always." E.L. Ltr. She writes that "[h]earing that man saying he was going to burn down the church really scared me," and that "[h]e used that curse word so I know he meant what he was saying." *Id.* Now, E.L. no longer goes to volunteer in the church office, because she cannot stand to be where she is unable to see

---

[3] Because the statements identify both women by name, the government will ask at the hearing that they be maintained in the Court's record as addenda to the PSR.

6

the door and watch who is coming in. *Id.* When she does go to the church, she positions herself where she can see who is coming up to the main entryway. *Id.* E.L., who lost her husband after the threatening call, states that before he died, "he told me not to let this feeling scare me but it still does," and that while she "hopes the feeling will go away," it is still there. *Id.* A place of comfort and refuge has become, for E.L., a place of fear.

The circle of victims does not end with the women and children who were physically present at Bible study that Sunday. The church itself—the most direct object of the threat—and by extension its entire congregation were affected. That is particularly true here in light of the historical resonance of the defendant's threat and the central role the church plays in its community.

First, the church itself. Founded by Pastor Dr. E. Ray Cox, Sr., in 1970, New Hope started without a physical building and with just a few dozen members. Two years later, the congregation broke ground on the church building. The church has since added a convocation center that serves as a gathering place for innumerable community events, including weddings, banquets, gospel competitions, concerts, and political meetings. Today, the church has hundreds of members and hosts a large group of ministries focused on good works across Hampton Roads, including a special drive to feed the hungry during the pandemic, visits to senior facilities, provisions for the Food Bank, a Sunday School, a youth ministry, and any number of outreach and evangelization ministries. The church also has a tradition of political engagement—Dr. Cox was a founding member of the Interdenominational Ministers Conference. New Hope, in other words, is enmeshed in its community and plays a central role in the lives of its congregants. It is a house of worship first and foremost, but also a safe gathering place and a source of collective spiritual strength—both a refuge and a symbol. The church is uniquely important to its

7

members, and so the threat to burn it was a threat to destroy more than just the building itself. That the threat was explicitly racial is almost certainly tied to the church's importance as a gathering place for its largely African American congregation.

The defendant is 63 years old. Anyone of his age who threatens to burn down, bomb, or otherwise attack an African American *church*, as opposed to some other building, consciously plays on a specific history of racialized violence, in the same way that someone who threatens to "lynch" someone, as opposed to some other manner of violent harm, taps into a specific history of extra-judicial terroristic violence. From the Sixteenth Street Baptist Church in 1963 to Charleston's Emanuel A.M.E. church in 2015, black churches have been targets of racist violence specifically because of their symbolic prominence in the African American community.

With that in mind, it is clear from the facts that the defendant here did not randomly select his target. He did not, to the government's knowledge, threaten any of the prominent white speakers at the prayer vigil, or their places of employment, or their homes, or their churches or synagogues. His decision to pair his threat to burn what he knew was an African American church, on a Sunday, with the demand that "you [n-words] need to shut the fuck up" makes his intent to terrorize crystal clear. If there were any question about his intent, the research he conducted on his phone answers it. Additionally, his actions were not done on the spur of the moment. He targeted New Hope Baptist twice, on separate days, and also targeted a second predominantly black church whose pastor was involved in the same prayer vigil. While his threat did not have its desired effect—if anything, it has galvanized the church's commitment to engage on justice issues—it certainly affected the women and children who heard it. It also had an impact on the day-to-day workings of the church, which has spent over $2,500 upgrading

its cameras and security system, and has had to ask for additional volunteers to help with the church's physical security.

It took just minutes for the defendant to make the cowardly, anonymous phone call that ended with a threat of racialized violence against a house of worship and two women teaching adult Sunday school. The after-effects of that call are still reverberating through the lives of those women and the entire church community. The nature and circumstances of the offense here are gravely serious.

B.    History and Characteristics of the Defendant

The defendant's history and characteristics, as detailed in the PSR, provide no hint as to why he committed this crime. He was raised in a stable and supportive household. PSR ¶ 31. He joined the Navy after high school and served 24 years, retiring as a Senior Chief after a number of deployments. PSR ¶¶ 32, 35, 49. He then worked as an IT technician and became a small business owner. PSR ¶¶ 47-48. The defendant has prior convictions for DUIs, PSR ¶¶ 23-24, but they occurred decades ago. The allegation of violence reflected in PSR ¶ 30 is disturbing, but the case was *nolle pros'd*. The defendant has been married three times and has several children and grandchildren. PSR ¶¶ 34-37. He reports no history of mental health or substance abuse issues. PSR ¶¶ 41-42. The numerous friends and family who wrote letters in support speak well of him. All of them appear to be shocked at what he did, describing it as out of character.

While the government does not discount the veracity of the defendant's friends and family, it is important to note that they are describing the person whom *they* know—the image the defendant presented to those he knew and cared for. Clearly there is another side to the defendant, one that he kept hidden from public view. Alone with his phone, the defendant ran a

9

series of disturbing searches, researched his targets, and then acted on what he had learned. The government is not requesting a sentence at the upper-end of the guideline range because of the defendant's thoughts or his internet searches. It makes its sentence request because of his actions: he called a church on a Sunday, knowing that this time he would reach someone there, and then carried out his plan of intimidation by telling the woman who answered that he was going to burn down her church. Faced with protected speech he did not like, the defendant resorted to a threat of active violence. He made that explicitly racial threat during a particularly fraught period and against a symbolic target. While the government is hopeful that the defendant's lack of recent convictions and his expressions of remorse mean that this behavior will never be repeated, his personal history, weighed against the nature and circumstances of the offense, does not undercut the need for a significant sentence within the guidelines range.

        C.        <u>Key § 3553(a) Factors – Specific and General Deterrence</u>

In addition to the need for a sentence that reflects the seriousness of the offense and provides just punishment, two key considerations from the § 3553(a) factors are specific and general deterrence. As to specific deterrence, the government has no way of knowing whether the defendant intended to act on his threat. The research he did, and the number of calls he placed, indicate that the threat, at least, was not an impulsive act. A significant sentence will dissuade the defendant from ever starting down that road again.

At least as important, though, is the message that a significant sentence will send to the community. After witnessing a diverse group of citizens exercising their rights of peaceful protest, prayer, and advocacy, the defendant attempted to intimidate them with a threat that tapped into a long and shameful history of racial violence. We as a community cannot tolerate that, or what it leads to. It must be absolutely clear to any who would seek to intimidate citizens

from exercising their constitutional rights by threats of violence that there are sure and certain consequences for making those threats. The interests of deterrence favor a significant sentence.

### III. Conclusion

Taking all the Section 3553(a) factors into account, the government respectfully submits that a sentence at the high end of the guidelines range is appropriate and not greater than necessary.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:    /s/
Andrew Bosse
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-6689
andrew.bosse@usdoj.gov

CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on this 5th day of November, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

      I HEREBY CERTIFY that on this 5th day of November, 2020, I sent by electronic mail a true and correct copy of the foregoing to the following:

      Jeffrey A. Noll
      Senior U.S. Probation Officer
      827 Diligence Drive, Suite 210
      Newport News, Virginia 23606

      /s/
      Andrew Bosse
      Assistant United States Attorney
      United States Attorney's Office
      101 West Main Street, Suite 8000
      Norfolk, Virginia 23510
      Office Number: 757-441-6331
      Facsimile Number: 757-441-6689
      andrew.bosse@usdoj.gov